**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:22-cv-146-MOC-SCR**

| | | |
|---|---|---|
| **LISA BENZING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **ORDER** |
| | ) | |
| **USAA OFFICER SEVERANCE PLAN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court on a Motion for Summary Judgment filed by Plaintiff Lisa

Benzing, (Doc. No. 19), and on a Motion for Summary Judgment filed by Defendant USAA

Officer Severance Plan, (Doc. No. 22). The Court held a hearing on the motions on June 22,

2023. This matter is ripe for disposition.

### I. FACTUAL AND PROCEDURAL BACKGROUND

**A.      Procedural Background to Plaintiff's Claim for Severance Benefits**

Plaintiff Lisa Benzing began working for United Services Automobile Association

("USAA") on September 30, 2019, as Vice President of Talent Development. Plaintiff was a

participant in the Defendant USAA Officer Severance Plan ("Severance Plan" or "Plan").

Defendant terminated Plaintiff's employment just seven weeks later on November 19, 2019, and

Defendant subsequently denied Plaintiff's claim for severance benefits. In this action, Plaintiff

brings a claim for wrongful denial of severance benefits under the Plan pursuant to Section

502(a)(1)(B) of the Employee Retirement Income Security Act (29 U.S.C. § 1001 et seq.). See

29 U.S.C. § 1132(a)(1)(B). Plaintiff also demands, as her second claim, attorney fees and costs.

**B. The Relevant Plan Language**

1

The Plan provides that "[i]n the event of a Qualifying Termination, the Plan Administrator will determine the Severance Pay, if any, to be provided to any Employee." (Plan § 4.1, AR48). The Plan Administrator (see Plan § 2.1(g), AR46) has "the discretionary authority to determine whether an event constitutes a 'Qualifying Termination'" (Plan § 2.1(j), AR47; emphasis added). A "Qualifying Termination" does "not include," among other things, "Termination due to the failure to meet standards of job performance." (Plan § 2.1(j)(iv), AR47).

Beyond the specifically enumerated power to determine whether a termination is "[q]ualified," the Plan grants the Plan Administrator broad discretionary authority:

> Notwithstanding anything to the contrary herein, the Plan Administrator shall have sole and absolute discretion to interpret the provisions of the Plan (including, without limitation, by supplying omissions from, correcting deficiencies in, or resolving inconsistencies or ambiguities in, the language of the Plan), to determine the rights and status under the Plan of any Eligible Employees and other persons, to resolve questions or disputes arising under the Plan and to make any determinations with respect to the benefits hereunder and the persons entitled thereto as may be necessary for the purposes of the Plan. In furtherance of, but without limiting the foregoing, the Plan Administrator shall have the following specific authorities, which he or she shall discharge in his or her sole and absolute discretion in accordance with the terms of the Plan (as interpreted, to the extent necessary, by the Plan Administrator):
>
> (a) To resolve all questions or disputes arising under the provisions of the Plan as to any individual's entitlement to become an Eligible Employee or the occurrence of a Qualifying Termination;
> (b) To determine the amount of benefits payable to any person under the Plan; and
> (c) To conduct the Claims Procedure specified in Section 5.3.
>
> All decisions of the Plan Administrator as to the facts of any case, as to the interpretation of any provision of the Plan or its application to any case, and as to any other interpretive matter or other determination or question under the Plan shall be final and binding on all parties affected thereby....

(Plan § 5.1, AR 51–52).

The Plan has a two-level claims procedure. A participant makes an initial claim for Plan benefits to the Claims Administrator, as delegate of the Plan Administrator. (Plan § 5.3(a), AR

52; AR 58). If the Claims Administrator denies the claim (AR 57–58), the participant may appeal

to the Plan Administrator (Plan § 5.3, AR 52–53).

Plaintiff applied for Severance Pay under the Plan on or about December 23, 2019. (AR

85). The Claims Administrator denied Plaintiff's application for Plan benefits because Plaintiff's

termination was not a "Qualifying Termination," but was due to her "failure to meet standards of

job performance":

> Under ERISA, the federal law that governs the Plan, the administrator is required
> to administer the plan in accordance with its written provisions and terms, as
> interpreted by the administrator. We have carefully considered the information
> related to your claim, and applied the terms of the Plan to your request. We have
> determined that you are not eligible for severance benefits under the Plan and
> your request must be denied because you have not had a "Qualifying
> Termination." A "Qualifying Termination" does not include a termination for the
> following:
>
> > • "Termination due to your failure to meet standards of job performance"
>
> The Plan provides severance benefits only in the event of a qualifying "Termination" of
> your employment, which is expressly defined on page 4 of the Plan.

(AR 57).

Plaintiff appealed to the Plan Administrator, who affirmed the denial of benefits on the

same ground as the Claims Administrator:

> I have carefully considered the documents, records and other information related
> to Ms. Benzing's appeal and per provisions and terms of the Plan, have applied
> the terms of the Severance Plan to her request.
>
> For the reasons set out below, I have concluded that Ms. Benzing is not eligible
> for severance benefits under the USAA Severance Plan and I am affirming the
> decision to deny her request for Severance benefits.
>
> As was previously communicated, under the USAA Severance Plan, only a
> "Qualifying Termination" of employment entitles a participant to severance
> benefits. As outlined in the USAA Severance Plan, there are various terminations
> that are excluded from the Plan's definition of "Qualifying Termination."

Among those excluded events is a "Termination due to your failure to meet standards of job performance."

The decision reached represents the Plan's final decision and action with respect to Ms. Benzing's claim.

(SAR 60). Plaintiff thereafter filed this civil action.

### C.    The Parties' Evidence Submitted on Summary Judgment

The parties submit vastly different versions of what happened during the short time Plaintiff was employed with USAA.

### i.    Plaintiff's Facts

Plaintiff asserts in Spring 2019, USAA's VP of Talent Rewards, Wendy Salmon, recruited Plaintiff for the position of VP of Talent Development at USAA. (AR 72). This position focused on human resource ("HR") issues associated with the development of USAA employees' skills and capabilities. These responsibilities were consistent with Plaintiff's employment background, which focused on human resource issues, especially as related to employee development and human capital for large organizations. (AR 73; see also AR 175–78).

On August 9, 2019, Plaintiff accepted the VP of Talent Development position based on the job duties and responsibilities verbally conveyed to her by USAA representatives. Among the USAA representatives who conveyed the duties and responsibilities of the VP of Talent Development Position to Ms. Benzing was Ms. Robin Kirby, the Senior VP of Human Resources and Plaintiff's immediate supervisor. When Plaintiff accepted the position, she withdrew from other career opportunities she had been contemporaneously contemplating. (AR 73). USAA never provided Plaintiff a written job description for her position of VP of Talent Development, and none is contained in the administrative record.

4

After accepting the position, Ms. Benzing relocated her family from Charlotte, North Carolina to USAA's headquarters in San Antonio, Texas. On September 30, 2019, Plaintiff began working for USAA. (AR 61). According to Plaintiff, immediately after she began work, USAA substantially changed her job duties. On October 3, 2019, Plaintiff met with Ms. Kirby, her supervisor. During that meeting, Ms. Kirby drastically changed Plaintiff's job duties, informing Plaintiff that Plaintiff would no longer be responsible for HR issues related to talent development, as discussed during Plaintiff's job interviews and consistent with Plaintiff's job title. Rather, Plaintiff would be responsible for overseeing work associated with USAA's recent consent order with the Office of the Comptroller of the Currency ("OCC") related to systemic failures surrounding USAA's banking ventures. (AR 74).

Later that day, Plaintiff contacted Ms. Salmon, who first recruited her, regarding her concern that the role Ms. Kirby had described was inconsistent with the position for which Plaintiff was hired. Ms. Salmon seemed equally confused and could not explain why the role had changed. Ms. Salmon also mentioned that Ms. Kirby had openly advocated against including Plaintiff on USAA's HR Operating Model Task Force (a group of HR leaders who reviewed how HR could be better structured), which would have been consistent with Plaintiff's initial job duties as VP of Talent Development. (AR 75–76). Ms. Salmon found this odd as well. (Id.).

Also on Oct. 30, 2019, Plaintiff met with Lori Gray, who told Plaintiff, "I heard about your situation. It sounds like the old 'bait and switch.'" Plaintiff had not talked to Ms. Gray or anyone in HR about her concerns with Ms. Kirby's changes to her role and directives. When Plaintiff asked Ms. Gray about the source of her concerns, Ms. Gray responded, "I'm in HR. We know everything." (AR 75).

Plaintiff asserts that, although the OCC review was not the kind of work Plaintiff was hired to do, she accepted the responsibility without issue. Over the next several weeks, Plaintiff worked with Chalice Jones, VP/HR Business Partner, to transition the OCC work fully to Plaintiff. On October 9, 2019, Plaintiff had a one-on-one meeting with Ms. Kirby to review the OCC response work. Plaintiff mentioned, again, that this was very different from the responsibilities described to her when Plaintiff interviewed to work for USAA. Ms. Kirby admitted that the job did not allow for HR talent development work, as originally represented to Plaintiff. (Id.).

On October 14, 2019, Plaintiff again met with Ms. Kirby at Ms. Kirby's request. It was at this meeting that Ms. Kirby first encouraged Plaintiff to leave USAA. While discussing the OCC work, Ms. Kirby said she spoke with HR regarding Plaintiff's sign-on bonus and relocation costs, and assured Plaintiff that USAA would not require her to pay back any relocation expenses. Ms. Kirby also shared her personal experience with the "bait and switch" from a previous employer and told Plaintiff she regretted staying with that employer as long as she did.

Given that Plaintiff had begun working at USAA a mere two weeks prior and was still in the onboarding process, Plaintiff was alarmed. Ms. Kirby did not, however, state or imply that Plaintiff's job performance was an issue. (AR 76). Later that afternoon, Ms. Jones contacted Plaintiff and expressed that USAA needed Plaintiff's leadership skills and that Plaintiff was an asset to the team. Ms. Jones reiterated that she would remain available to Plaintiff to ensure a smooth transition of the OCC response work.

On October 15, 2019, Plaintiff met with Ms. Kirby to express that she understood the changes Ms. Kirby was implementing to Plaintiff's position and that she was "all in." By Plaintiff's account, Ms. Kirby appeared surprised and discouraged by Plaintiff's enthusiasm and

commitment. (Id.). The next day, October 16, 2019, Ms. Kirby told Plaintiff that Plaintiff would not present to USAA's Board of Directors in November, which presentation had been scheduled since before Plaintiff's first day at work. When Plaintiff asked why, Ms. Kirby said only that the timing was not right. Plaintiff was disappointed, as the presentation offered Plaintiff an opportunity to demonstrate her HR expertise. However, over the next several days, Plaintiff completed the work she was assigned and continued to receive positive feedback from her peers. Plaintiff received no complaints or reports of unsatisfactory performance. (Id.).

On October 28, 2019, USAA's Executive Vice President/Chief Human Resources Officer, Pat Teague, invited Plaintiff to attend Ms. Teague's HR Leadership Staff Meeting in place of Ms. Kirby. Moments before the meeting, however, Ms. Kirby's administrative assistant relayed that Plaintiff should not attend Ms. Teague's meeting. (AR 77). Instead, Ms. Kirby wanted Plaintiff to attend an information technology ("IT") meeting. Plaintiff found this odd because IT was not within her expertise or skillset, nor was it in any way related to the responsibilities for which she was hired. Plaintiff asked whether the IT meeting was mandatory and explained that she was already on her way to Ms. Teague's meeting but was told that the IT meeting was mandatory. Plaintiff attended the IT meeting. (Id.).

During the IT meeting, the Senior VP of IT explained that USAA failed its OCC audit and that IT needed someone new to lead the project. Ms. Kirby appointed Plaintiff as the new lead for the IT Skills Training and refused to provide her any resources. At this point, Plaintiff believed Ms. Kirby was intentionally setting Plaintiff up to fail. Plaintiff did not have the requisite experience and/or knowledge in IT, and Ms. Kirby knew that. Plaintiff proactively reached out to contacts from previous jobs for suggestions to tackle the work. (Id.; see also AR 92 (chart showing differences in three separate jobs assigned to Plaintiff)).

The next day, Plaintiff reached out to Jamie Wetherell, a USAA HR Business Partner, about this second change in Plaintiff's position in four weeks. Ms. Wetherell suggested Ms. Kirby's behavior over the past several weeks may be because Ms. Kirby was opposed to hiring Plaintiff from the very beginning. According to Ms. Wetherell, the Talent Acquisition team had asked Ms. Wetherell to intervene after Ms. Kirby directed them to not interview Plaintiff. Separately, Ms. Teague also apologized to Plaintiff for the confusion regarding her role and responsibilities. (AR 74).

On October 30, 2019, during an HR Town Hall, Ms. Teague disclosed that HR was cutting its budget by $37 million. That same day, Ms. Wetherell called Plaintiff and acknowledged that USAA owed Plaintiff clarity on her role. She also asked Plaintiff the "dollar amount" that would relieve the "hardship" Plaintiff endured from taking the position with USAA and relocating her family to San Antonio. (AR 77). Plaintiff became concerned that her employment was in jeopardy. Regardless, Plaintiff remained committed to doing her job. For instance, Plaintiff continued to meet with Ms. Jones and transition onto the OCC work. As evidence of this commitment and continued engagement with her work and responsibilities, copies of Plaintiff's calendar entries for the week before her termination and notes taken during those meetings are included in the filed administrative record. (AR 78–79 (providing detailed outline of meetings); AR 104–74 (calendar entries and meeting notes)).

On Thursday, November 14, 2019, Ms. Wetherell told Plaintiff that, according to Ms. Kirby, "[s]taying is no longer an option." (AR 79). Plaintiff was devasted, given that six weeks earlier she had accepted USAA's offer, intending to help the company with her longstanding HR experience. Because of Plaintiff's job, she and her husband relocated to San Antonio and purchased property there. Plaintiff was directed to communicate only with Ms. Wetherell until

Plaintiff's last day was announced. Later that same evening, Ms. Wetherell informed Plaintiff that Ms. Kirby had directed Plaintiff "not to return to the office." (AR 79–80). The following Monday, November 19, 2019, in a conference call, Ms. Kirby terminated Plaintiff. Ms. Wetherell and Mr. Menendez were also present on the call. (AR 80). Plaintiff represents she has an audio recording of the November 19 call wherein Kirby notified Plaintiff of the termination, in which Kirby told her:

> We are going to move forward with the termination.
>
> We just feel that we don't have the confidence any longer that your interest is here in the role and that your ability to deliver at the pace and the quality level that is going to be required as we go forward is going to be there.

(AR 80, 85).

Plaintiff had never been counseled for performance issues or told her work was inadequate before her employment was terminated.

### ii. Defendant's Facts

USAA's statement of facts diverges significantly from Plaintiff's. USAA does not acknowledge Plaintiff's contentions that her job responsibilities were significantly changed after she started her job. Defendant asserts, instead, that as soon as Plaintiff started working at USAA, it became abundantly clear to Defendant that Plaintiff was not qualified for the position. Defendant presents the following evidence for its version of the events leading to Plaintiff's termination:

On November 18, 2019, the day before Ms. Kirby terminated Plaintiff's employment, Employee Relations informed the Legal Department that Plaintiff's employment was being terminated due to "Loss of Confidence." (SAR 70). On November 19, Rebecca Campos, Employment Relations Transaction Specialist, documented the reason for Plaintiff's termination

as "Involuntary>Loss Confidence/Lack Judgment" on a document titled "View Terminate Employee Event: Terminate: Lisa Benzing," (SAR 7). Campos further explained that Plaintiff was terminated for "loss of confidence due to inability to perform" her job duties. (SAR 71).

The Salesforce Case document memorializing Plaintiff's termination likewise records Plaintiff's "involuntary termination: inability to perform role." (SAR 73). Human Resources' "[s]eparation summary on Lisa Benzing" included the following:

- Plaintiff told Kirby of her "displeasure" at the focus of her work.

- Much of Plaintiff's work "did not interest her," even though "it was part of the full scope of the role she was hired to perform."

- In the week preceding Plaintiff's termination, her relationship with Kirby became "tenuous" (Plaintiff's word).

- Plaintiff "refused to continue meeting with" Kirby.

- Plaintiff "stopped coming to the office."

- Plaintiff "missed several meetings without notice."

(SAR 6). The "[s]eparation summary" continues:

> Because of this lack of engagement, lack of accountability for the full portfolio of work she was hired to deliver, and inability to transition into acceptance mode on the scope and urgency on the Learning work, Robin Kirby lost confidence in Lisa's ability to adequately engage and deliver at the required pace. As such, Robin Kirby made the decision to terminate Lisa's employment effective 11/19/19 for loss of confidence/lack of judgment.

(Id.).

According to Defendant, the above reasons reflect a "[t]ermination due to the failure to meet standards of job performance" under the Plan. Defendant asserts that, in Plaintiff's application for severance pay, she essentially admitted the validity of the reasons for her termination:

- "I was transparent with Robin [Kirby] re: my concerns and told her that the Learning/Training area was not my biggest passion or area of deep subject matter expertise." (AR 89)
- Plaintiff told HR Business Partner Jamie Wetherell "I was not interested in leaving USAA, and that I just needed time to understand how I can make an impact in the training/learning Consent Order space given that wasn't my area of deep subject matter expertise." (AR 89)
- On October 15, 2019, Kirby "cautioned me to 'be careful with this. It seems you are mentally looking for timelines regarding doing the work that's fun for you.'" (AR 89)
- "It became very evident that my skills no longer aligned with the new job requirements." (AR 90)
- "And, in full transparency, I would not have hired me to do the role as Robin [Kirby] has since defined it." (AR 90)
- "I do not have experience designing technical skills training programs or leading IT technical training projects." (AR 90)
- "[N]or do I have experience de-centralizing training or working in a Consent Order/highly audited environment." (AR 90)

Defendant further asserts that the Administrative Record is clear that the Plan Administrator had evidence before her indicating that Plaintiff was terminated because she failed to meet standards of job performance. For example, information provided to the Plan Administrator indicated:

Lisa Benzing (EID: Y9976) was hired as the VP, Talent Development, effective 09/30/19. Throughout several onboarding meetings with her direct leader (SVP, Talent - Robin Kirby, EID: U4209) and others in the HR function, Lisa shared her displeasure that the focus of the role would involve a significant percentage of her

11

time on Learning & Development. Although the work did not interest her, it was part of the full scope of the role she was hired to perform (was called out in job description and job posting detail) and part of the experience she had from prior roles (though admittedly at a different altitude). In the week prior to her separation, Lisa's relationship with Robin became so tenuous – as described by Lisa – that she refused to continue meeting with Robin, stopped coming in the office, and missed several meetings without notice. Because of this lack of engagement, lack of accountability for the full portfolio of work she was hired to deliver, and inability to transition into acceptance mode on the scope and urgency on the Learning work, Robin Kirby lost confidence in Lisa's ability to adequately engage and deliver at the required pace. As such, Robin Kirby made the decision to terminate Lisa's employment effective 11/19/19 for loss of confidence/lack of judgment.

(SAR 06; see also SAR 01; SAR 28; SAR 37).

## II. STANDARD OF REVIEW

This matter is before the Court on the parties' cross motions for summary judgment. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts that might affect the outcome of the case (as determined by reference to the substantive law) properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F. Supp. 2d 409 (W.D.N.C. 2011). The nonmoving party

opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. Id.

When considering cross-motions for summary judgment, a court evaluates each motion separately on its own merits using the standard set forth above. See Rossignol v. Voorhaar, 316 F.3d 516, 522 (4th Cir. 2003); accord Local 2-1971 of Pace Int'l Union v. Cooper, 364 F. Supp. 2d 546, 554 (W.D.N.C. 2005). Both Plaintiff and Defendants have moved for summary judgment, and so the Court will analyze each motion in turn.

Notably, "ERISA benefit actions are usually adjudicated on summary judgment rather than at trial." Skinder v. Fed. Express Long Term Disability Plan, 2021 WL 1377982, at *1 (W.D.N.C. Apr. 12, 2021) (citing Vincent v. Lucent Techs., Inc., 733 F. Supp. 2d 729, 733–34 (W.D.N.C. 2010)); see also Leahy v. Raytheon Co., 215 F.3d 11, 17–18 (1st Cir. 2002) ("In an ERISA benefit denial case, trial is usually not an option ... [the district court in ERISA benefits denial cases] does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary"). In such cases, the threshold issue for this Court is what standard of review to apply in reviewing Defendant's denial of Plaintiff's claim for severance benefits.

In Firestone Tire & Rubber Co. v. Bruch, the Supreme Court held that a denial of benefits "is to be reviewed under a de novo standard of review unless the benefit plan gives the

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989); see also Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629–30 (4th Cir. 2010) (reservation of discretionary authority requires abuse of discretion standard of review). As noted above, the Plan in this action confers the requisite discretionary authority. Plaintiff argues, however, that the standard of review should be de novo for two reasons.

First, Plaintiff argues that the administrator named in the Plan did not make the benefits determination. The Plan named the Executive Vice President, Human Resources as the Plan Administrator. (Plan § 5.1, AR 51). That person was Patricia Teague. (Answer, ¶16). However, Plaintiff notes that Jeanne Hertz, the Vice President of Shared Service—HR, made the benefits determination. (Answer, ¶ 17; AR 182–83). Plaintiff asserts that the administrative record contains no delegation by Ms. Teague to anyone (including Ms. Hertz). Plaintiff contends, therefore, that Ms. Hertz's denial ought to be reviewed under a de novo standard. E.g., Grooms v. Reliance Standard Life Ins. Co., No. 1:08cv795, 2009 WL 2878448, at *3 (M.D.N.C. Sept. 3, 2009) ("I do not find any language in the policy granting discretionary powers to Wachovia as the administrator, nor do I find a provision in which [the plan administrator] has expressly delegated its discretionary authority to Wachovia; therefore, it appears that de novo review is appropriate.").

Second, Plaintiff argues that the de novo standard of review applies because Defendant repeatedly failed to comply with ERISA's claim procedures, resulting in Plaintiff not receiving a full and fair review of her claim. As Plaintiff notes, under ERISA, every employee benefit plan is required to have an internal claims procedure. 29 U.S.C. § 1133. ERISA's Claims Procedure Regulation, contained at 29 C.F.R. § 2560.503-1, prescribes "minimum requirements for

14

employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 65 Fed. Reg. at 70265 (Federal Register notice of final claims procedures regulations). See ERISA §§ 503, 505; 29 U.S.C. §§ 1133, 1135. The preamble to the Claims Procedure Regulation provides that "the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference." 65 Fed. Reg. at 70255; see also Halo v. Yale Health Plan, 819 F.3d 42, 51 (2d Cir. 2016) ("[W]hen a plan fails to comply with those minimum requirements [in the ERISA claims regulations], the plan's decision denying a claim should not be entitled to deference in court."). Plaintiff asserts that the Plan and its fiduciaries did not comply with the minimum procedural requirements prescribed by the Claims Procedure Regulation in the following ways:

• Defendant failed to provide Plaintiff the specific reasons for the denial of her initial claim for benefits, as required by 29 C.F.R. § 2560.503-1(g)(1)(i) and (iii).

• Defendant failed to provide Plaintiff copies of information allegedly relevant to Plaintiff's claim despite Plaintiff's request for the same, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iii).

• Defendant failed to consider any of the documents Plaintiff submitted for her appeal in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv). AR 182–83 (failing to respond to Plaintiff's documentation on appeal).

• Defendant failed to provide Plaintiff specific reasons for the denial of her appellate claim in violation of 29 C.F.R. § 2560.503-1(j)(1). AR 182–83 (providing no specific reasons for denial of claim on appeal other than same conclusory assertion stated in the initial denial letter).

15

• Defendant failed to advise Plaintiff of her right to documents and information used in adjudicating her claim on appeal, in violation of 29 C.F.R. § 2560.503-1(j)(3); AR 182–83 (failing to so advise Plaintiff).

• Defendant failed to comply with the 90-day requirement in 29 C.F.R. § 2560.503-1(f)(1) to provide Plaintiff the specific reasons for the denial. The Plan provided the reason 155 days after, when Mr. Menendez stated Plaintiff's claim was denied because she did not attend required meetings the final week of her employment, including meetings with her supervisor Robin Kirby.[1]

• Defendant failed to comply with ERISA's requirements in 29 C.F.R. § 2560.503-1(j)(1), (3) to provide the reasons for the denial, to notify Plaintiff that she was entitled to receive document, records, and other information, and a fortiori, failed to do so within 60 days. 29 C.F.R. § 2560.503-1(i)(1)(i); AR 182–83 (denial notice).

(Doc. No. 19-1, pp. 19–22). Plaintiff argues that Defendant's foregoing failures dictate that a de novo standard of review applies. Fessenden v. Reliance Standard Life Ins. Co., 927 F.3d 998 (7th Cir. 2019) (holding that ERISA's notification timing requirements were unalterable and that de novo review was required where the fiduciary did not timely notify claimant of denial in compliance with ERISA regulations).

In Reply, Defendant first argues that the Plan submitted with its opposition papers includes a copy of the Delegation and Appointment of Authority of Plan Administrator Functions, signed by Patricia Teague, Executive Vice President, Human Resources, and

---

[1] Plaintiff asserts that she attended all such meetings, including six meetings with her supervisor Robin Kirby. Plaintiff provided her calendar entries and meeting notes to Defendant during the administrative process showing that Plaintiff attended all such meetings. (Doc. No. 19-1, pp. 15–16).

16

appointing Jeanne Hertz "to serve as Plan Administrator in administering and managing the Plans," including the USAA Officer Severance Plan, "effective as of August 20, 2019." Included in the delegation and appointment were the "authority, rights, powers and duties: ... (4) To determine all questions arising under the Plans, including the questions regarding the rights or eligibility of employees and former employees, and the respective benefits of the Participants and others entitled thereto[.]" (Doc. No. 29-2). Thus, according to Defendant, Teague clearly delegated the administrator functions to Hertz. Defendant also contests Plaintiff's argument that non-compliance with the ERISA regulations requires a de novo standard of review.

The Court rejects Plaintiff's arguments for a de novo standard of review. First, Defendant has shown that Teague clearly delegated the administrator functions to Hertz. The fact that Defendant failed to submit the delegation form to Plaintiff before the summary judgment proceedings does not transform the standard of review to de novo. Moreover, the Court agrees with Defendant that, at the least in the Fourth Circuit, noncompliance with § 2560.503-1 is not an abuse of discretion and does not require de novo review absent proof that the plan participant was prejudiced. See, e.g., Cannon v. Charter Commc'ns Short Term Disability Plan, No. 18-CV-041, 2019 WL 235325, at *7 (W.D.N.C. Jan. 16, 2019) (no abuse of discretion where "even if" defendant violated § 2560.503-1, "such a violation was not prejudicial") (citing Worsely v. Aetna life Ins. Co., 780 F. Supp. 2d 397, 406–07 (W.D.N.C. 2011)); Potter v. Shoney's, Inc., 108 F. Supp. 2d 489, 495 (M.D.N.C. 1999) (where "the record contains no evidence that Plaintiff has been prejudiced by these procedural violations and Plaintiff does not allege prejudice or harm as a result of the procedural deficiencies," the "technical violations" she complains of "do not constitute an abuse of discretion"). Accordingly, the abuse of discretion standard applies in this case.

17

The abuse of discretion standard is the most deferential review standard in American jurisprudence. Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 168 (4th Cir. 2013); Brown v. Nucor Corp., 785 F.3d 895, 928 (4th Cir. 2015). "When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation." Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d 170, 176 (4th Cir. 2005). Thus, courts "will not disturb a plan administrator's decision if the decision is reasonable, even if [they] would have come to a contrary conclusion independently." Williams v. Metro. Life Ins. Co., 609 F.3d 622, 630 (4th Cir. 2010). A plan administrator's decision is reasonable "if it is a result of a deliberate, principled decision process" supported by "substantial evidence." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008) (internal quotation and citation omitted).

The "substantial evidence" standard is not high; it is merely evidence sufficient for a court to give the case to a jury rather than direct a verdict. LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984); Young v. State Farm Mut. Auto. Ins. Co., No. 2:18cv1469, 2019 WL 6833854, at *5 (S.D. W. Va. Dec. 13, 2019). It is Plaintiff's burden to prove that substantial evidence, so defined, was absent from the administrative record. See, e.g., Ayres v. Kyanite Mining Corp., No. 14-cv-1, 2015 WL 4393991, at *5 (W.D. Va. July 16, 2015) ("The plaintiff bears the burden of demonstrating, based on the record evidence, that the Committee's decision was unreasonable and not supported by substantial evidence.").

In assessing the reasonableness of the plan administrator's decision, a court may consider eight factors, first enumerated in Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335 (4th Cir. 2000):

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to

which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Refaey v. Aetna Life Ins. Co., 467 F. Supp. 3d 328, 339 (W.D.N.C. 2020) (quoting Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth, 201 F.3d at 342–43)). Consideration of the Booth factors is "not mandatory." Millage v. B.V. Hedrick Gravel & Sand Co. Emp. Benefit Plan, No. 10cv140, 2011 WL 4595999, at *5 (W.D.N.C. Sept. 30, 2011).

"[T]h[e] court's review is limited to the record that was before the plan administrator at the time of the final determination," McGhee v. Aetna Life Ins. Co., 63 F. Supp. 3d 572, 580 (W.D.N.C. 2014), and "[t]he burden of proving an abuse of discretion rests with the plaintiff[.]" Innes v. Barclays Bank PLC Staff Pension Plan Comm., No. 15cv18, 2017 WL 111787, at *6 (W.D. Va. Jan. 11, 2017), aff'd, 698 F. App'x 147 (4th Cir. 2017); accord, e.g., Grabowski v. Hartford Life & Accident Ins. Co., No. 16-cv-01384, 2017 WL 6390963, at *6 (E.D. Va. Aug. 23, 2017), aff'd, 747 F. App'x 923 (4th Cir. 2018); Martin v. Hartford Life & Accident Ins. Co., No. 12-2134, 2013 WL 5297146, at *3 (D. Md. Sept. 18, 2013); see also, e.g., Refaey, 467 F. Supp. 3d at 346–47 (noting plaintiff "has the burden to prove that she is entitled to receive disability benefits under the Plan," and holding "plaintiff has failed to prove that Aetna's decision was unreasonable under the Booth factors").

Where the parties file cross-motions for summary judgment on the administrative record, it is appropriate for the Court to "treat[] the motions and the citations of evidence in the administrative record in the manner it would a bench trial": first considering "the evidence contained in the administrative record which Plaintiff has cited in h[er] favor and then

19

considering the record evidence by Defendant." McGhee, 63 F. Supp. 3d at 580 (citing Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, No. 09-2612, 2012 WL 122362 (D. Md. Jan. 12, 2012)).

## III. DISCUSSION

Under the highly deferential standard of review applicable here, this Court must conclude that Defendant did not abuse its discretion in denying Plaintiff's claim for severance benefits because Defendant's decision was supported by substantial evidence. In determining the reasonableness of Defendant's decision, the Court applies the Booth factors and makes the following findings:

1. The language of the plan. The Plan prohibits the award of benefits to participants who were terminated "due to the failure to meet standards of job performance." (Plan § 2.1(j)(iv), AR 47). Here, Defendant determined that Plaintiff failed to meet standards of job performance. The Plan Administrator was consequently required to deny her benefits. See, e.g., Refaey, 467 F. Supp. 3d at 340 ("A prudent claims administrator is charged with the responsibility of both honoring valid claims as well as denying invalid claims"); 29 U.S.C. § 1104(a) (subjecting fiduciaries to the "[p]rudent man standard of care"). While Plaintiff disputes Defendant's contention that she was not meeting the standards of her job performance, even in the wrongful termination context, it is the employer's assessment of an employee's performance that counts, not the employee's.[2] See, e.g., Moser's v. Driller's Serv., Inc., 988 F. Supp. 2d 559, 564 n.10

---

[2] Plaintiff asserts that she received $560,000 in bonus payments from Defendant after her employment was terminated. Plaintiff asserts that this is evidence that she was performing her job duties as expected; otherwise, she would not have received the bonus payments. Defendant notes, however, that the payment of the bonuses was in error due to bureaucratic oversight, as their payment had been contemplated only as part of a separate and release agreement that Plaintiff never signed. And Defendant notes that Plaintiff has not offered to return the bonus

(W.D.N.C. 2013) ("In evaluating performance, 'it is the perception of the decision maker which is relevant'") (quoting <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980)); <u>Moore v. Wal-Mart Stores E., LP</u>, No. 16-cv-362, 2018 WL 401544, at *7 (W.D.N.C. Jan. 12, 2018) ("In determining whether plaintiff was performing his job satisfactorily, '[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff'") (quoting <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 960–61 (4th Cir. 1996)). This factor weighs in favor of finding that the administrator's decision was reasonable.

2. <u>The purposes and goals of the plan</u>. Section 1.2 of the Plan is titled "Purpose" and states: "The purpose of the Severance Plan is to ease the economic stress of loss of employment with the Employer by providing Eligible Employees with Severance Pay as hereinafter set forth." (AR 45). The general language of § 1.2 is construed in light of the rest of the Plan, which expressly limits the award of severance say to participants whose termination was a "[q]ualifying [t]ermination," and excludes from the definition of [q]ualifying [t]ermination "[t]ermination due to the failure to meet standards of job performance." (Plan § 2.1(j)(iv), AR 47; Plan § 4.1, AR48). <u>See, e.g.</u>, <u>Johnson v. Am. United Life Ins. Co.</u>, 716 F.3d 813, 820 (4th Cir. 2013) ("ERISA plans, like contracts, are to be construed as a whole"). Thus, it serves the purpose and goals of the Plan to deny benefits to a participant who, like Plaintiff, was terminated "due to the failure to meet standards of job performance" and is thus not "eligible" to receive severance pay. This factor weighs in favor of finding that the administrator's decision was reasonable.

3. <u>The adequacy of the materials considered to make the decision and the degree to which they support it</u>. There is no evidence the materials considered were inadequate. To the contrary,

---

payments. Defendant further notes that it paid for all of Plaintiff's relocation costs to move from North Carolina to Texas, and Defendant did not seek reimbursement of these costs.

Plaintiff submitted a lengthy, 10-page, single-spaced initial application for benefits (AR 85–94), and her attorney submitted an even longer letter in support of her appeal. (AR 71–83). Plaintiff contends that before she was fired, Defendant did not communicate with her, through write-ups or otherwise, that Defendant was not satisfied with her job performance. Indeed, there are no negative performance reviews in the record. Defendant attributes this to the fact that Defendant became aware, almost immediately after Plaintiff started her job, that she was in over her head. Defendant notes evidence in the record of Plaintiff making statements such as Plaintiff telling Kirby of her "displeasure" at the focus of her work; stating that much of Plaintiff's work "did not interest her" even though "it was part of the full scope of the role she was hired to perform"; and stating she would not have hired herself for the job. Defendant asserts that it would have been a waste of time and money to retain Plaintiff longer solely in order to give her negative performance reviews before it inevitably fired her.

Plaintiff, on the other hand, suggests that she made those statements because Defendant immediately changed her job responsibilities when she started the job, basically setting her up to fail. The Court finds credible Plaintiff's contentions that, upon beginning her employment with USAA, some of her job responsibilities were inexplicably changed. Plaintiff clearly expressed displeasure with this, and she communicated to her superiors that she lacked the experience to perform certain tasks, such as taking over duties related to the OCC. As to other job duties, such as Learning & Development, the parties dispute that these were in Plaintiff's initial job description. However, given the highly deferential standard this Court must apply, the evidence provides more than the "scintilla" of evidence necessary for the Court to find here that the administrator's determination was supported by substantial evidence. See Zeckoski v. Elsevier, Inc., No. 3:19-CV-349-GCM-DCK, 2021 WL 5356494, at *8 (W.D.N.C. Sept. 29, 2021), report

and recommendation adopted, No. 3:19CV349-GCM-DCK, 2021 WL 5355928 (W.D.N.C. Nov. 16, 2021). This factor weighs in favor of finding that the administrator's decision was reasonable.

4. Whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan. As discussed above, the Plan Administrator's interpretation was consistent with the Plan's provisions, which the Administrator has discretion to interpret and apply. There is nothing in the administrative record about earlier interpretations of the Plan. This case is thus analogous to Refaey, where the Court held with respect to the fourth Booth factor:

> Aetna's decision is consistent with the pertinent Plan provisions. Aetna is afforded discretion to make decisions of benefit eligibility under the Plan definition of "disability." The record contains no evidence of any inconsistencies between Aetna's decision and any previous interpretations of the Plan. Thus, application of this factor weighs in favor of finding that Aetna's decision was reasonable.

Refaey, 467 F. Supp. 3d at 343. Thus, the fourth Booth factor weighs in favor of finding that the administrator's decision was reasonable.

5. Whether the decision-making process was reasoned and principled. Plaintiff's benefit claim required nothing more than the application of the Plan's language to the simple facts underlying Plaintiff's termination. While Plaintiff contends that Defendant unfairly assigned her to tasks for which she lacked expertise, there is "no evidentiary basis to suggest that the adequacy of the materials considered to make the decision was insufficient or that the decision-making process was unreasoned and unprincipled." Plotnick v. Computer Scis. Corp. Deferred Comp. Plan for Key Execs., 182 F. Supp. 3d 573, 604 (E.D. Va. 2016), aff'd, 875 F.3d 160 (4th Cir. 2017); see also, e.g., Murphy v. Int'l Painters & Allied Trades Indus. Pension Fund, No. 13-cv-28760, 2015 WL 13746658, at *15 (S.D. W. Va. Apr. 6, 2015) (fifth Booth factor satisfied

where fund administrator and trustees (i.e., claims administrator and plan administrator) "applied the pertinent plan language to the relevant evidence contained in Plaintiff's administrative file at both stages of the review process" and noting that administrators "were not required to adopt Plaintiff's view"), adopted, 2015 WL 5722809 (S.D. W. Va. Sept. 29, 2015). This factor weighs in favor of finding that the administrator's decision was reasonable.

6. Whether the decision was consistent with the procedural and substantive requirements of ERISA. All ERISA requires is that "plan participants be notified in writing of any benefit denial, and that they be given an opportunity for a full and fair hearing by those denying the claim." Refaey, 467 F. Supp. 3d at 346. Here, the plan administrator clearly issued a written decision, explaining the reasoning underlying the denial of benefits, and the Court finds that Plaintiff was given a full and fair hearing on her claim. Id. Plaintiff argues that the decision was too scant, as it did not address Plaintiff's arguments and evidence regarding her drastic change in job responsibilities. She also contends that the administrator should have contacted the various employees who told Plaintiff it seemed that she had become victim of a "bait and switch" at USAA, where her job responsibilities were vastly changed once she started her job. Plaintiff contends that the administrator ignored an investigation into this evidence, which would have supported Plaintiff's claim that her job was essentially sabotaged from the very beginning of her employment. Plaintiff also contests Defendant's statements that Plaintiff missed various meetings during her last week of work and that she refused to work with Ms. Kirby.[3]

As Defendant correctly notes, the administrator was not required to interview the persons Plaintiff named in her submissions. While Plaintiff insists that this would have shown that

_____

[3] To this assertion, Defendant responds that Plaintiff has provided inaccurate dates for the various meetings she contends that she did not miss. The parties clearly dispute whether Plaintiff refused to attend various meetings.

24

Plaintiff was subject to an unfair "bait and switch" at her job, Plaintiff has not shown that this would have changed Defendant's decision. The parties clearly dispute the extent to which Plaintiff's job duties changed and whether she was given tasks for which she was hired. But it is Defendant's, not Plaintiff's, perception of her job performance that matters. Furthermore, under the "more than a scintilla" standard of review, Defendant's burden for showing reasonableness is low. In sum, this factor weighs in favor of finding that the administrator's decision was reasonable.

       7. Any external standard relevant to the exercise of discretion. Here, there appears to be no additional external standard of review relevant to the administrator's exercise of discretion. Thus, this factor is neutral.

       8. The fiduciary's motives and any conflict of interest it may have. The Plan provides that USAA "shall pay [s]everance [p]ay from its current operating funds." (Plan § 3.1, AR 48). Plaintiff must show that this policy created a conflict of interest affecting the Plan Administrator's decision. Here, at most, Plaintiff has shown that there was a structural conflict, but that it not enough to show that Defendant's reasoning was unreasonable. See, e.g., Griffin v. Hartford Life & Accident Ins. Co., 898 F.3d 371, 383 (4th Cir. 2018) (Since "in this case, there is no evidence that any such conflict impacted Hartford Life's adjustment and review of Griffin's claim," the "structural conflict, alone, is not sufficient to render Hartford Life's entire decisionmaking process unreasonable"). This factor weighs in favor of finding that the administrator's decision was reasonable.

       Here, the Court finds that, after considering the Booth factors and applying the extremely deferential abuse of discretion standard, the administrator's decision to deny Plaintiff's severance

claims was reasonable. The Court will therefore grant the Plan summary judgment and dismiss the First Claim for Relief with prejudice.

Finally, because Plaintiff's substantive ERISA claim fails, so does her claim for attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1). The Court therefore grants the Plan summary judgment on that claim as well and dismisses Plaintiff's claim for attorney fees (Plaintiff's Second Claim for Relief) with prejudice.

## V.    CONCLUSION

For the reasons stated herein, the Court finds that Defendant did not abuse its discretion in denying severance benefits to Plaintiff. Thus, Defendant is entitled to summary judgment.

**IT IS THEREFORE ORDERED THAT:**

(1) The Motion for Summary Judgment filed by Plaintiff, (Doc. No. 19), is **DENIED**;

(2) The Motion for Summary Judgment filed by Defendant, (Doc. No. 22), is

    **GRANTED**, and this action shall be dismissed with prejudice.

(3) The Clerk shall terminate this action.

Signed: September 26, 2023

Max O. Cogburn Jr.
United States District Judge